IN UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHARLOTTE PHILLIPS and BOB
MYRICK*, individually and on behalf of all
others similarly situated*,

        Plaintiffs,

    v.

WELLPOINT INC., UNICARE NATIONAL
SERVICES, INC., UNICARE ILLINOIS
SERVICES, INC., UNICARE HEALTH
INSURANCE COMPANY OF THE
MIDWEST, RIGHTCHOICE MANAGED
CARE, INC., and RIGHTCHOICE
INSURANCE COMPANY,

        Defendants.

No. 10-cv-00357-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on defendants' motion for summary judgment (Doc.

116). Plaintiffs filed a response in opposition (Doc. 186) and to defendants' statement of

undisputed material facts (Doc. 187), to which defendants replied (Doc. 202). For the following

reasons, the Court grants defendants' motion for summary judgment.

## FACTS

The claims in this case arise from the same events underlying the claims in *Cima v.*

*WellPoint Health Networks, Inc.*, No. 05-cv-4127, previously before this Court. The Court has

recounted the factual and procedural background of this claim in detail on several occasions. *See*

*e.g., Phillips v. WellPoint, Inc.*, No. 10-cv-357, 2012 WL 4490688 (S.D. Ill. Sept. 27, 2012);

*Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374 (S.D. Ill. 2008); *Cima v. WellPoint*

*Healthcare Networks, Inc.,* No. 05-cv-4127, 2006 WL 1914107 (S.D. Ill. July 11, 2006).

For purposes of this motion for summary judgment, the relevant facts are as follows. Plaintiffs were insureds of RightCHOICE Insurance Company and/or its parent corporation RightChoice Managed Care, Inc. ("RightCHOICE" collectively). In 2001, WellPoint, Inc.[1] ("WellPoint") acquired RightCHOICE. Prior to this acquisition, WellPoint had to obtain the approval of the Illinois Department of Insurance ("IDOI"). As part of that approval process, WellPoint filed "Form A" which represented to the IDOI that it had "no present plans" to make material changes to RightCHOICE's business. Plaintiffs contend, however, that this was a misrepresentation made only for the purposes of obtaining regulatory approval, and WellPoint intended all along to withdraw RightCHOICE from the Illinois market. Thereafter, RightCHOICE did withdraw from the Illinois market, and RightCHOICE insureds were forced to convert to more expensive polices through Unicare National Services, Inc., Unicare Illinois Services, Inc., and Unicare Health Insurance Company of the Midwest, ("Unicare" collectively) which are subsidiaries of WellPoint. Insureds who could not afford the higher policy rates were forced to go through underwriting leaving many infirm insureds ineligible for insurance or eligible only for higher-priced insurance. Those who were ineligible or could not afford to accept a Unicare policy were forced to seek other coverage or go without health insurance.

Plaintiffs originally brought four claims including two Illinois Health Insurance Portability and Accountability Act ("Illinois HIPAA") claims, one breach of contract claim, and one Illinois Consumer Fraud Act ("CFA") and Uniform Deceptive Trade Practices Act claim. Subsequent to the Court's ruling on defendants' motion to dismiss, the only remaining claims are for breach of contract and unfair practices under the CFA. The Court will now consider whether

---

[1] As plaintiffs explain in their complaint, "[t]he WellPoint corporate group was the product of WellPoint Health Network Inc. formed from the for-profit conversion of Blue Cross of California." Doc. 1-1, p. 26. "WellPoint Inc. was formed by the 2004 merger of WellPoint Health Network Inc. and Anthem Inc." *Id*. WellPoint Health Network, Inc. was named as a defendant in the *Cima* complaint. However, in the instant complaint, the plaintiffs name WellPoint, Inc. as a defendant rather than WellPoint Health Network, Inc.

defendants are entitled to judgment as a matter of law with respect to the remaining breach of contract and CFA unfair practices claim.

## ANALYSIS

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.  Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).  Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

3

## I.      Breach of Contract Claim

In their complaint, plaintiffs allege

142. . . . Defendants owed duties and obligations to [p]laintiffs and members of the class under the Subject Policies at issue, among others, to renew and not discontinue the policies except as allowed under the terms of the Subject Policies.

143. Defendants materially breached the terms and provisions of the subject policies owned by [p]laintiffs and class members when it discontinued [p]laintiffs' insurance with RightCHOICE and gave notice that the RightCHOICE plans will no longer be available shortly after and as a result of the merger of RightCHOICE and WellPoint, and then either forcing the insureds to renew their health insurance coverage under a new WellPoint/Unicare policy or automatically be enrolled in the WellPoint – Unicare 1000 Deductible Plan.

Doc. 1-2, p. 3.  These allegations are stated identically to the *Cima* plaintiffs' breach of contract allegations.  *Cima*, No. 05-4127, Doc. 2-1, p. 18.

Plaintiffs point to two portions of the RightCHOICE policies in support of their claim that defendants both explicitly and implicitly breached the RightCHOICE policies.  In support of their implicit breach argument, plaintiffs cite to Article II.H of the Certificate, which arguably incorporates Illinois HIPAA , as follows:

H. **Conformity with State Statutes.**  This Certificate is issued for delivery in the State of Illinois, and shall be governed by the laws of that State and any applicable federal laws.  Any Certificate provision that, on the Enrollment Date, is in conflict with the laws of the state where the Subscriber then lives is automatically amended to conform to the minimum requirements of those laws.

Doc. 1-3, p. 20; Doc. 1-1, p. 32.  In support of their explicit breach arguments, plaintiffs point to provisions of the "Guaranteed Renewal" portion of the RightCHOICE policy, which closely tracks the relevant Illinois HIPAA provisions, as follows:

A.  Termination of Certificate.  All insurance will cease on termination of the Certificate.

1.  RightCHOICE may nonrenew or discontinue health insurance Coverage of an individual for any of the following:

. . .

c.  Termination of Coverage.  RightCHOICE is ceasing to offer Coverage in the individual market in accordance with state law.

If RightCHOICE decides to discontinue offering a particular type of health insurance coverage in the individual market, coverage may be discontinued only if RightCHOICE provides notice to each Subscriber at least 90 days prior to the discontinuation and then provides each member the option to purchase any other individual product currently being marketed.

If RightCHOICE decides to discontinue offering all health insurance coverage in the individual market, coverage may be discontinued only if RightCHOICE provides notice to each Subscriber at least 180 days prior to the date of expiration of their Coverage.

Doc. 103, p. 37.

In *Cima*, this Court concluded that all *Cima* defendants were entitled to judgment as a matter of law with respect to the *Cima* plaintiffs' breach of contract claim.  *Cima v. WellPoint Health Networks, Inc.*, No. 05-4127, 2008 WL 4671707 (S.D. Ill. Oct. 22, 2008).  *Cima* plaintiffs asserted that their "claim of breach of insurance policy rests on the fact that RightCHOICE was not actually withdrawing or discontinuing its policies, it was simultaneously and in coordinated fashion, at the direction of WellPoint, converting the very same insureds to an on-going subsidiary, Unicare."  Accordingly, the Court noted that "[p]laintiffs seek to prove that RightCHOICE and Unicare are alter egos and that both are under the direction and control of WellPoint."  However, *Cima* plaintiffs "failed to present evidence from which the Court could reasonably conclude that RightCHOICE and Unicare [were] merely 'shell corporations' acting under the control and direction of WellPoint."

Here, defendants argue they are entitled to judgment as a matter of law on plaintiffs' breach of contract claim because RightCHOICE complied with the non-renewal provision of plaintiffs' policies and Illinois HIPAA, RightCHOICE's liabilities were not assumed by any

other defendants, and defendants who were not parties to the RightCHOICE policies cannot be held liable for its breach. Accordingly, the Court now will consider the *Phillips* parties' arguments with regard to both RightCHOICE's and the other defendants' liability for their alleged breach of the RightCHOICE policies.

### a. Breach of Contract Claim – RightCHOICE

With respect to RightCHOICE's liability, plaintiffs' argument depends on the Court adopting its "enterprise-wide" view of the relevant HIPAA provisions. To that end, plaintiffs make a legislative intent argument contending that "Congress and the Illinois legislature never intended to permit rerating on intercompany transfers within a controlled group." Doc. 186, p. 11. Specifically, plaintiffs request this Court to make findings that "1) on the date of the transaction, the HIPAA provisions would be applied on an enterprise-wide basis[;] 2) Illinois HIPAA must be read in light of federal HIPAA's purpose, to guarantee renewability except in very limited circumstances[;] and 3) WellPoint's purported 'market withdrawal' was at best a perverse reading of the law, and violates public policy."

At the time of the conversion, the relevant Illinois HIPAA provisions provided as follows:

> (A) In general. Except as provided in this Section, a health issuer that provides individual health insurance coverage to an individual shall renew or continue in force such coverage at the option of the individual.
> (B) General exceptions. A health insurance issuer may nonrenew or discontinue health insurance coverage of an individual in the individual market based on one or more of the following:
> . . .
> (3) Termination of plan. The issuer is ceasing to offer coverage in the individual market in accordance with subsection (C) of this Section and applicable Illinois law.
> . . .
> (C) Requirements for uniform termination of coverage.
> (1) Particular type of coverage not offered. In any case in which an issuer decides to discontinue offering a particular type of health insurance coverage offered

6

in the individual market, coverage of such type may be discontinued by the issuer only if:

(a) The issuer provides notice to each covered individual provided coverage of this type in such market of such discontinuation at least 90 days prior to the date of the discontinuation of such coverage;

(b) The issuer offers, to each individual in the individual market provided coverage of this type, the option to purchase any other individual health insurance coverage currently being offered by the issuer for individuals in such market; and

(c) In exercising the option to discontinue coverage of that type and in offering the option of coverage under subparagraph (b), the issuer acts uniformly without regard to any health status-related factor of enrolled individuals or individuals who may become eligible for such coverage.

(2) Discontinuance of all coverage.

(a) In general.  Subject to subparagraph (c), in any case in which a health insurance issuer elects to discontinue offering all health insurance coverage in the individual market in Illinois, health insurance coverage may be discontinued by the issuer only if:

(i)    the issuer provides notice to the Director and to each individual of the discontinuation at least 180 days prior to the date of the expiration of such coverage; and

(ii)   all health insurance issued or delivered for issuance in Illinois in such market is discontinued and coverage under such health insurance coverage in such market is not renewed.

(b) Prohibition on market reentry.  In the case of a discontinuation under subparagraph (a) in the individual market, the issuer may not provide for the issuance of any health insurance coverage in Illinois involved during the 5–year period beginning on the date of the discontinuation of the last health insurance coverage not so renewed.

215 ILCS 97/50.

Effective August 8, 2005, the following amendments, what plaintiffs deem "an affiliated enterprise group view," were made to Illinois HIPAA to bring the issuer's affiliates within the statute's coverage.

Definitions.
"Affiliate" means a person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the person specified.
. . .
(C)(2)(a)
(iii) in the case where the issuer has affiliates in the individual market, the issuer gives notice to each affected individual at least

7

180 days prior to the date of the expiration of the coverage of the individual's option to purchase all other individual health benefit plans currently offered by any affiliate of the carrier.

. . .

(c) If an issuer elects to discontinue offering all health insurance coverage in the individual market under subparagraph (a), its affiliate that offer health insurance coverage in the individual market in Illinois shall offer individual health insurance coverage to all individuals who were covered by the discontinued health insurance coverage on the date of the notice provided to affected individuals under subdivision (iii) of subparagraph (a) of this item (2) if the individual applies for coverage no later than 63 days after the discontinuation of coverage

(d) Subject to subparagraph (e) of this item (2), an affiliate that issues coverage under subparagraph (c) shall waive the preexisting condition exclusion period to the extent that the individual has satisfied the preexisting condition exclusion period under the individual's prior contract or policy;

(e) An affiliate that issues coverage under subparagraph (c) may require the individual to satisfy the remaining part of the preexisting condition exclusion period, and may include in any coverage issued under subparagraph (c) any waivers or limitations of coverage that were included in the individual's prior contract or policy.

The changes to this Section made by this amendatory Act of the 94th General Assembly apply only to discontinuance of coverage occurring on or after the effective date of this amendatory Act of the 94th General Assembly.

215 ILCS 97/50 (eff. Aug. 8, 2005).  Defendants argue this last sentence, making this amendment effective only after August 8, 2005, demonstrates the legislature's intent that the prior version of Illinois HIPAA did not apply to affiliates.  Plaintiffs, however, argue that this last sentence of the August 8, 2005, amendment is irrelevant because a subsequent General Assembly cannot alter the intent of the original General Assembly that enacted Illinois HIPAA.

A subsequent addition to a law presumptively makes a change to the law rather than an interpretation of earlier intent.  *In re Det. of Lieberman*, 776 N.E.2d 218, 229 (Ill. 2002).  That presumption may be overcome, and "[t]he circumstances surrounding the amendment should be considered and: 'If they indicate that the legislature intended only to interpret the original act, the

8

presumption of an intention to change the law is rebutted.'"  *Id*. at 230-31 (quoting *Illinois v. Parker*, 526 N.E.2d 135 (Ill. 1988)).  However, "the legislative intent that controls the construction of a public act is the intent of the legislature which passed the subject act, and not the intent of the legislature which amends the act."  *O'Casek v. Children's Home and Aid Soc. Of Ill.*, 892 N.E.2d 994, 1007 (Ill. 2008).   As Illinois Supreme Court Justice Clark stated:

> This task [of discerning legislative intent] is complicated enough.  We complicate it still further when we seek to infer what one legislature intended from the subsequent action of a later legislature, composed of different members and perhaps working towards different purposes.

*Id*. at 1007-08 (quoting *People v. Hicks*, 518 N.E.2d 148 (1987) (Clark, C.J. dissenting)).

The 94th General Assembly explicitly stated that its amendments were only to be effective after August 8, 2005.  However, this declaration by the 94th General Assembly cannot be used to discern the original legislative intent of the 90th General Assembly that passed the Illinois HIPAA provisions applicable in this case.  The Court will now discern whether the 90th General Assembly intended that affiliates of policy issuers be included within the reach of the relevant provision of Illinois HIPAA.  Specifically, the Court must undertake a statutory construction inquiry to determine whether the 90th General Assembly intended to include affiliates of health insurance companies within the definition of "health insurance issuer."

"The primary rule [of statutory construction] is that courts should ascertain and give effect to the intention of the legislature."  *U.S. Fire Ins. Co. v. Barker Car Rental*, 132 F.3d 1153, 1156 (7th Cir. 1997).  A statute's language provides the best indication of legislative intent, and the court "must give the statutory terms their ordinary meaning."  *Id*.  "When the language of the statute is certain and unambiguous, the only legitimate function of the judiciary is to enforce the law as enacted by the legislature."  *Id*.  The Court acknowledges that plaintiffs

make a somewhat persuasive statutory construction argument and will explain that argument as follows.

The doctrine of *in pari materia* provides that "two legislative acts that address the same subject are considered with reference to one another so that they may be given harmonious effect." *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 962 N.E.2d 956, 964 (Ill. 2012). "This doctrine is consistent with [the concept] that one of the fundamental principles of statutory construction is to view all of the provision of a statute as a whole." *Land v. Bd. of Educ. of City of Chi.*, 781 N.E.2d 249, 254-55 (Ill. 2002); *accord In re Application for Judgment and Sale of Delinquent Props. for Tax Year 1989*, 656 N.E.2d 1049, 1053 (Ill. 1995) ("Statutes should also be construed in conjunction with other statutes addressing the same subject.").

Under the portion of Illinois HIPAA applicable at the time of the conversion

'[h]ealth insurance issuer' mean[t] an insurance *company*, insurance service, or insurance organization (including a health maintenance organization, as defined herein) which is licensed to engage in the business of insurance in a state and which is subject to Illinois law which regulates insurance . . . .

215 ILCS 97/5 [emphasis added]. The Illinois Insurance Code defines "company" as

an insurance or surety company and shall be deemed to include a corporation, company, partnership, association, society, order, individual or aggregation of individuals engaging in or proposing or attempting to engage in any kind of insurance or surety business, including the exchanging of reciprocal or inter-insurance contracts between individuals, partnerships, and corporations.

215 ILCS 5/2(e). These two statutes both fall under the Illinois Insurance Code and both address the topic of insurance. Accordingly, it is appropriate for the Court to read these two statutes together so as to give them a harmonious effect and to ascertain the intent of the Illinois legislature.

The Court can easily exclude several of the terms contained in 215 ILCS 5/2(e) which are deemed to be included in the term "company" because they cannot be construed to define the relationship between RightCHOICE and the other defendants.  For instance, this relationship is not properly defined as an "aggregation of individuals."  The Illinois Insurance Code does not define "individual", but defines "person" as "an individual, aggregation of individuals, corporation, association and partnership."  215 ILCS 5/2(l).  Thus, the statute distinguishes individuals from corporations and leads the Court to conclude that the Illinois legislature did not intend to include companies, such as the defendants, within the meaning of the term "individual."

The Court, however, finds that more consideration should be paid to the term "association" in determining whether it properly defines the relationship between RightCHOICE and the other defendants.  The Illinois Insurance Code does not define the term "association." The Illinois Supreme Court, however, has explained "association" as follows.

> In a general sense, an association is a body of persons acting together, without a charter, for the prosecution of a common enterprise. In *People v. Brander*, 244 Ill. 26, 91 N.E. 59, 135 Am.St.Rep. 301, 18 Ann.Cas. 341, we designated the term 'association' as 'a word of vague meaning, used to indicate a collection of persons who have joined together for a certain object.' And in *Roach & Co. v. Harding*, 348 Ill. 454, 181 N.E. 331, 336, we said: 'The term 'association' is used to designate a body of persons acting together without a charter but on methods and forms used by incorporated bodies for the prosecution of some common enterprise. The term does not have, in law, a fixed meaning such as is accorded to partnerships or corporations, but is used to indicate a collection of persons who have joined together for a certain object. Our statute does not contain a definition of an association. It has, however, been defined in Vol. 1 Bouv. Law Dict. (p. 269) as persons uniting together for some purpose. Black's Law Dictionary defines 'association' as the act of a number of persons who unite or join together for some special purpose or business; 'the union of a company or business for the transaction of designated affairs or the attainment of some common object.''

*Chi. Grain Trimmers Ass'n v. Murphy*, 58 N.E.2d 906, 908-09 (Ill. 1945).

An Illinois Appellate Court addressed the term "association" in the context of the Illinois Securities Law. *Stein v. Twilight Motel, Inc.*, 172 N.E.2d 642, 644 (Ill. App. Ct. 1961).  That court, noting that the act at issue "should be liberally construed to better protect the public from deceit and prevent fraud," stated that "[t]he essential characteristic [of "association] is merely the acting together by a group or body of persons without a charter for prosecution of a common purpose." *Id*.

RightCHOICE and the other defendants are distinct corporations; however, the record shows that these companies all worked together to reach their common objective to effect RightCHOICE's withdrawal.  For instance, in an email from Mark Gastineau, working in various capacities for Unicare and/or WellPoint, to Sandra Van Trease, Mark Gastineau clearly indicates that Unicare and WellPoint were involved in the RightCHOICE market withdrawal.  *See* Doc. 191-6, p. 2.  For instance, Gastineau describes a meeting in which he says, "I hope during this meeting to determine if we want to merge entities first and then move business or if we can terminate the business in RightChoice first and then merge the local entities." *Id*.  There is nothing to indicate that the legislature intended to employ a more restrictive meaning of the term "association" than the Illinois courts had already defined years before the enactment of the statute.  Thus, construing these statutes together, one could be led to believe that the relationship between the defendants may be included within the meaning of "health insurance issuer" as defined by Illinois HIPAA.

The Court, however, while persuaded by plaintiffs' argument, finds that a plain reading of the language of the statute forces the opposite result.  The statute clearly defines a "health insurance issuer" as "an insurance company, insurance service, or insurance organization (including a health maintenance organization, as defined herein) *which is licensed to engage in*

*the business of insurance in a state* and which is subject to Illinois law which regulates insurance . . . . 215 ILCS 97/5 [emphasis added]. The statutory language indicates that Illinois legislators intended these terms to refer to individually-licensed organizations, not associated groups of individually-licensed organizations. RightCHOICE and Unicare were licensed individually to engage in the business of insurance in Illinois. There was not one license under which these affiliates operated. Thus, a plain reading of the statute indicates that legislative intent precludes plaintiffs' statutory construction argument. For several reasons, including the absence of any legislative history discussing the treatment of affiliates, the Court finds it highly likely that the Illinois 90th General Assembly did not intend to effectuate plaintiffs' enterprise-wide theory. Illinois legislators in the 90th General Assembly probably never even conceived of a situation as what the plaintiffs have presented to the Court, and thus could not have intended that the language of the statute cover such a situation. It is likely for that reason that the 94th General Assembly amended the Illinois HIPAA to cover the actions of affiliates.

Accordingly, with respect to plaintiff's breach of contract claim, the Court finds that defendants are entitled to judgment as a matter of law against RightCHOICE.

**b. Breach of Contract Claim – Other Defendants**

Even if the Court were to adopt plaintiffs' "enterprise-wide" theory, the Court still finds that the other defendants would not be liable under the RightCHOICE policies. With respect to the liability of the other defendants, unlike the *Cima* plaintiffs, plaintiffs do not argue a veil-piercing or alter-ego theory of liability. Indeed, in their complaint, plaintiffs did not put defendants on notice that they planned to rely on a veil-piercing or alter-ego theory, and the Court would not consider such an argument at this point in litigation. *See Sunny Industries, Inc. v. Rockwell Intern. Corp.*, 2002 WL 32345675, at *8-9 (W.D. Wis. Feb. 5, 2002) (granting

summary judgment where plaintiff failed to plead veil piercing in complaint); *see also Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 860 (7th Cir. 1999).  Plaintiffs, however, argue that "liability should be imputed to WellPoint and Unicare for RightChoice's so-called withdrawal, without having to pierce any corporate veil, under well-established Illinois law, rendering parent companies fully liable as principals when constituent subsidiaries commit wrongs pursuant to enterprise policy."  Doc. 186, p. 19.

As a basic principle of contract law, a non-party cannot be held liable for a breach of contract.  *See Credit Gen. Ins. v. Midwest Indem. Corp.*, 926 F. Supp. 766, 772 (N.D. Ill. 1996). Also, corporations are normally not liable for their affiliates' actions.  *See Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569 (7th Cir. 1985).  However, "it has long been acknowledged that parents may be 'directly' liable for their subsidiaries' actions when the 'alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management."  *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 235 (Ill. 2007) (quoting *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 486-87 (3d Cir. 2001)).

Illinois law recognizes recovery under the above-referenced direct participant liability theory.  *Forsythe.*, 864 N.E.2d at 238.  Specifically, the Illinois Supreme Court has found that "[w]here there is evidence sufficient to prove that a parent company mandated an overall business and budgetary strategy *and* carried that strategy out by its own specific direction or authorization, surpassing the control exercised as a normal incident of ownership in disregard for the interests of the subsidiary, that parent company could face liability."  *Id*.  "[T]he key elements . . . are a parent's specific direction or authorization of the manner in which an activity is undertaken and foreseeability."  *Id*.

However, as this Court pointed out to the *Cima* plaintiffs, "there is no authority from any Illinois state court employing the direct participant doctrine to make a corporation that is not a signatory to a contract a de facto party to the contract."  *Cima v. WellPoint Health Networks, Inc.*, 556 F. Supp. 2d 901, 906 (S.D. Ill. 2008) (finding "no merit in [the *Cima*] plaintiffs' theory of direct participant liability for breach of contract").  The Court is mindful that in applying state law, federal courts must be conservative, not innovative.  A federal court must apply state law in the manner in which it believes the highest state court would apply it.  *See, e.g.*, *Association Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007) (citing *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001)).  Federal Courts should not "speculate on any trends in state law."  *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir. 1987).  "Respect for state courts as the primary expositors of state law counsels restraint by federal court in announcing new state law principles."  *Gust K. Newberg Constr. Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir. 1987).

Here, the *Phillips* plaintiffs make the same argument that was rejected by this Court in *Cima*.  They cite to three cases allegedly supporting their argument that the direct participant liability theory is applicable to their breach of contract claim, including *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227 (Ill. 2007); *Esmark, Inc. v. NLRB*, 887 F.2d 739 (7th Cir. 1989); and *BP Amoco Chem. Co. v. Sun Oil Co.*, 316 F. Supp. 2d 166 (D. Del. 2004).  None of these cases, however, lend support to the application of the direct participant liability theory to Illinois contract law.  The Court will examine each case in turn.

In *Forsythe* the Illinois Supreme Court considered a tort claim and does not address whether direct participant liability applies in a contract claim.  *See id.* at 237-38.  In fact, the Illinois Supreme Court specifically stated that its conclusion was "supported by the policy-based

factors courts use to determine whether a *duty* exists," and does not discuss any policy factors related to contracts. *See id.* (emphasis added).   Thus, the Court finds *Forsythe*'s analysis irrelevant to plaintiffs' breach of contract claim.

In *Esmark*, a case involving federal labor law, the Seventh Circuit acknowledged that "a parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful actions." *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 756 (7th Cir. 1989).  Specifically, on review was the National Labor Relations Board's finding that a parent could be held liable for the unfair labor practices of its subsidiaries under a direct participation theory. *Id.* at 745.  Accordingly, *Esmark* provides no guidance as to whether direct participant liability theory is applicable to a breach of contract claim under Illinois law.

Finally, plaintiffs cite to a case from the District of Delaware in support of their argument that the direct participant liability theory applies to a breach of contract claim under Illinois law. *See BP Amoco Chem. Co. v. Sun Oil Co.*, 316 F. Supp. 2d 166 (D. Del. 2004). Not only does *BP Amoco* fail to address Illinois law, it takes up an apportionment of environmental liabilities claim arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, not a breach of contract claim. *See id.* at 167.  Accordingly, *BP Amoco* is inapposite to the present case.

As this Court pointed out to the *Cima* plaintiffs, represented by the same counsel as the instant plaintiffs, plaintiffs asserting novel theories of state law "must come forward with some authority to support their view that they have a right to the relief they seek." *Piscoiotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007).  The *Phillips* plaintiffs fail to point to any Illinois authority applying the direct participant liability to a breach of contract claim, and the Court is unable to find any such authority that would change its reasoning as set forth in *Cima*.

16

*See Cima v. WellPoint Health Networks, Inc.*, 556 F. Supp. 2d 901, 904-07 (S.D. Ill. 2008).  The Court also notes that other district courts considering Illinois law have applied the direct participant liability theory only to tort claims.  *See Destiny Health Inc. v. Connecticut General Life Ins. Co.*. 741 F. Supp. 2d 901, 907-08 (N.D. Ill. 2010) (considering direct participant liability with respect to a misappropriation of trade secrets claim).

The Court is also mindful that when a court is "faced with opposing plausible interpretations of state law," the court should "choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability." *Birchler v. Gehl Co.*, 88 F.3d 518, 521 (7th Cir. 1996).    The Court maintains its conclusion from *Cima*, wherein it found that a plausible interpretation of Illinois law is that the direct participant doctrine does not authorize the imposition of liability for breach of contract.  The Court will leave it to the Illinois state courts to determine whether liability under the direct participant liability theory should be expanded to breach of contract claims.

For the foregoing reasons, the Court finds that defendants are entitled to judgment as a matter of law with respect to plaintiffs' breach of contract claims against defendants WellPoint, Inc., Unicare National Services, Inc., Unicare Illinois Services, Inc., and Unicare Health Insurance Company of the Midwest.  Accordingly, the Court grants defendants' motion for summary judgment with respect to plaintiffs' breach of contract claim as to all defendants.  Now, the Court will turn to consider whether defendants are entitled to judgment as a matter of law with respect to plaintiffs' CFA unfair practices claim.

## II.    CFA Unfair Practices Claim

In their complaint, plaintiffs allege that defendants engaged in a deceptive act or practice in violation of the CFA by their "conduct of canceling the insurance policy and then requiring

the insureds to reapply, con[n]vert, or forego coverage . . . ."  Doc. 1-2, p. 5.  In *Cima*, this Court

declined to dismiss this identical claim under the standards for a motion to dismiss.  In that order,

the Court characterized defendants' conduct as "immoral, unethical, oppressive, and

unscrupulous," and noted that *Cima* plaintiffs may be able "to premise a cause of action on

WellPoint's representations to the IDOI, if it did make them knowing it was going to cause

RightCHOICE to withdraw . . . ."  *Cima v. WellPoint Health Networks, Inc.*, 2006 WL 1914107,

at *19 (S.D. Ill. July 11, 2006).

As a remedial statute, the CFA "[i]s to be liberally construed to effectuate its purpose."

*Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002).  The CFA provides that

> unfair methods of competition . . ., including but not limited to the use or
> employment of any deception, fraud, false pretense, false promise,
> misrepresentation or the concealment, suppression or omission of any material
> fact, with intent that others rely upon the concealment, suppression or omission of
> such material fact . . . in the conduct of any trade or commerce are hereby
> declared unlawful whether any person has in fact been misled, deceived or
> damaged thereby.

815 ILCS 505/2.  The Illinois Supreme Court has declared that the elements of either an unfair

practices or deceptive conduct CFA claim are: "(1) a deceptive act or practice by the defendant;

(2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the

deception during a course of conduct involving trade or commerce."  *Robinson*, 775 N.E.2d at

960.

Defendants allege they are entitled to judgment as a matter of law on the CFA unfair

practices claim because "the undisputed evidence shows that the decision to withdraw RIC from

the market was made well after the Form A[2] filing," and "there is no evidence that defendants'

---

[2] On November 19, 2001, in Form A, WellPoint represented to the IDOI that it

> has no *present plans* to cause RightCHOICE, RIC or any Acquired Subsidiary to . . . merge or
> consolidate them with any person or persons, other than the Merger.  There are also presently no

conduct violated public policy." Doc. 116, pp. 18-23. Defendants point out that RightCHOICE did not withdraw until months after Form A was filed, options other than a withdrawal were still being considered in April 2002, and WellPoint's General Counsel attested that no decisions were made concerning RightCHOICE prior to the merger.

Defendants further allege that their conduct did not violate public policy because the IDOI reviewed and approved RightCHOICE's withdrawal plan. Specifically, IDOI reviewed and approved the letters RightCHOICE sent to policyholders notifying them of the withdrawal. Further, defendants rely on the meeting between IDOI officials and RightCHOICE representatives in which the withdrawal was discussed. Thereafter, Naftzger sent a letter in which he stated, "We believe we have the Department's approval to proceed as set forth in this letter. If that is incorrect, please notify me as soon as possible upon your receipt and review of this letter." Doc. 116, p. 21. The IDOI did not respond to this letter, and defendants rely on this as an implicit approval. Other letters were exchanged between the IDOI and defendants discussing RightCHOICE's withdrawal. Defendants also point out that the IDOI has represented that the RightCHOICE withdrawal complied with the law. Finally, defendants argue that the Illinois legislature's subsequent amendment to Illinois HIPAA, which requires an affiliate to offer coverage to discontinued insureds without considering health-related factors, represents a "concession" by Illinois legislators that Illinois HIPAA did not previously address defendants' actions.

---

plans to make any other material change in RightCHOICE's, RIC's or any other Acquired Subsidiary's business operations or corporate structure, other than as may be provided herein or as may arise in the ordinary course of business, and other than to achieve the synergies that normally arise in substantial acquisitions.

Doc. 116, p. 18 (emphasis added).

Plaintiffs, however, allege that defendants are not entitled to judgment as a matter of law on the CFA unfair practices claim because "[a] jury could conclude that WellPoint and Unicare never had any intention to continue the RightCHOICE Illinois business after the merger."  Doc. 186, p. 24.  Specifically, plaintiffs cite to the following facts from which a jury could conclude defendants intended to withdraw RightCHOICE from the market when they filed Form A with the IDOI:

> From before the merger (when RightCHOICE was showcasing its BCBSMO and Healthlink businesses; and considering whether to even keep the Illinois operation in business with exit strategies on the shelf), WellPoint's due diligence that RIC's business overlapped and was losing money and proposed to WellPoint a "shutdown effect", the Unicare decision informing RMC that any Illinois business would proceed under the Unicare brand (as early as October 29, 2001), to Mr. Mailander's December 2001 recognition that from prior to mid-December, RIC was no longer processing new applications, to the post merger closing where WellPoint/Unicare did not take any action or ascertain whether RightCHOICE's Illinois business could be made profitable.

Doc. 186, p. 25.  Now, the Court will turn to consider whether plaintiffs have presented sufficient evidence from which a jury could reasonably conclude that defendants made false statements on Form A to the IDOI.

Construing the evidence in the light most favorable to plaintiffs, the Court finds that there is insufficient evidence from which a jury could conclude that WellPoint had "present plans" to withdraw RightCHOICE from the market at the time it filed Form A with the IDOI.  Plaintiffs present multiple instances of what they purport to evidence defendants' "present plans" to withdraw RightCHOICE from the market prior to WellPoint's filing of Form A.  However, none of the evidence offered by plaintiffs actually indicates WellPoint had a "present plan" at the time it filed Form A to cause RightCHOICE to withdraw from the market.

Specifically, plaintiffs argue the evidence shows that RightCHOICE's Illinois business was not profitable, and that RightCHOICE was considering withdrawing from the Illinois market

20

prior to its acquisition by WellPoint.  *See* Doc. 190, p. 7. (Van Trease and Campbell discussed RightCHOICE's Illinois "exit strategy" and agreed to have an exit strategy "on the shelf."). This, however, only indicates that RightCHOICE considered a withdrawal.  It does not speak to WellPoint's "present plans" at the time it filed Form A with the IDOI.  Next, plaintiffs offer evidence that WellPoint's Unicare brand was in competition with RightCHOICE.  *See* Doc. 190, p. 15 (due diligence report that RightCHOICE's Illinois product "appears to be a complimentary fit with the Unicare businesses operating in the Midwest").  Still, this does not speak to WellPoint's "present plans" at the time it filed Form A to withdraw RightCHOICE from the Illinois market.

Finally, plaintiffs cite to the October 29, 2001 minutes of the RightCHOICE board of directors' meeting as evidence that a decision was made that the Midwest business would not continue under the RightCHOICE name.  *See* Doc. 190, p. 109.  In their statement of facts, plaintiffs state that "within 10 days of the merger announcement, RightCHOICE decided its Illinois business would operate going forward as Unicare."  Doc. 188, p. 15.  However, as defendants point out in their reply, plaintiffs have misrepresented in their brief what the evidence actually states.  Plaintiffs cite to the deposition of Stuart Campbell, a former RightCHOICE official who became the senior vice president of WellPoint and president of Blue Cross Blue Shield of Missouri subsequent to the RightCHOICE acquisition, for this fact.  That deposition, however, shows that Campbell actually denied that a decision had been made to withdraw RightCHOICE from the market at the time the report in question was made.  Doc. 192-3, p. 100. The plaintiffs have simply failed to present any evidence from which a fair-minded jury could conclude that WellPoint had "present plans" at the time it filed Form A to withdraw RightCHOICE from the market.  Thus, no genuine issue of material fact exists and defendants

are entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).  Accordingly, the Court grants defendants' motion for summary judgment with respect to plaintiffs' CFA unfair practices claim.

## CONCLUSION

In conclusion, the Court **GRANTS** defendants' motion for summary judgment (Doc. 116) with respect to plaintiffs' breach of contract and CFA unfair practices claim.  The Court **DENIES** defendants' motion for summary judgment (Doc. 116) with respect to plaintiffs' Illinois HIPAA and deceptive practices claims as **MOOT** because the Court previously dismissed those claims.  The Court further **DENIES** plaintiffs' motions for an extension of time to file a response (Docs. 175 & 180), for reconsideration of order denying class certification (Doc. 214), and for review of the magistrate judge's discovery rulings (Doc. 217) as **MOOT**.  As no claims remain pending, the Court **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:**  December 10, 2012

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**